# UNITED STATES DISTRICT COURT

### for the

#### Western District of North Carolina

FILED
ASHEVILLE, N.C.

OCT 15 2019

U.S. DISTRICT COURT
W. DIST. OF N.C.

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*

INFORMATION ASSOCIATED WITH
THE GOOGLE LLC ACCOUNT:
WALTER.ROBERTS@BRBAPPRAISAL.COM

)
)
)
)
)
)
)

Case No.  1:19 mj 91

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A to the accompanying Affidavit.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B to the accompanying Affidavit.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. s 371 | Conspiracy |
| 26 U.S.C. s 7206(1) | Filing a False Return or Other Document |
| 26 U.S.C. s 7206(2) | Aiding and Assisting in Preparation of False Tax Return |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jennifer W. Berry, Special Agent IRS-CI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/15/2019

*Judge's signature*

City and state:  Asheville, North Carolina

Judge W. Carleton Metcalf

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FOLLOWING ACCOUNT THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE LLC:<br><br>**WALTER.ROBERTS@BRBAPPRAISAL.COM** | Case No. 1:19 mj 91<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Jennifer Berry, having been duly sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent ("SA") with the Internal Revenue Service, Criminal Investigation ("IRS-CI"), and I have been since 2009. I work out of the Charlotte, North Carolina, field office, and I have investigated a wide variety of tax-related and non-tax-related financial crimes, including but not limited to the crimes of tax evasion, bank fraud, money laundering, wire fraud, and identity theft. From 1997 through 2009, I was a public accountant, and I obtained a license as a Certified Public Accountant ("CPA") in the State of North Carolina during that time. I am a graduate of the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia, administered by the Department of Homeland Security, and of the National Criminal Investigator Training Academy ("NCITA"), administered by IRS-CI. I have worked multiple financial investigations in this district, in collaboration with investigators from numerous other federal, state, and local law enforcement agencies.

2.      I am submitting this affidavit in support of my application for a warrant that would authorize a search of records and other data that are associated with the email account **WALTER.ROBERTS@BRBAPPRAISAL.COM**, hereinafter referred to as the "**TARGET**

1

ACCOUNT," and that would also authorize the seizure of certain contents and records found pursuant to that search. The information associated with the **TARGET ACCOUNT** that will be subject to a search is stored at premises controlled by Google LLC ("Google"), which is headquartered in Mountain View, California, and which I will serve by electronic means or at 1000 Amphitheater Parkway, Mountain View, California 94043. The information associated with the **TARGET ACCOUNT** that will be subject to a search is described in detail in Attachment A.

3. More particularly, I am making this affidavit in support of an application for a warrant to be issued pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). The warrant would require Google to assist the authorities by searching the information described in Attachment A, and by then disclosing to the government copies of the particular contents and records (including the contents of communications) that are described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, the government will review that information to locate the items described in Section II of Attachment B. The government will seize and retain those items for evidentiary purposes.

4. I am basing the facts set forth in this affidavit on my personal knowledge and on information obtained from other individuals during my participation in this investigation. My team has conducted interviews of witnesses, reviewed documents and records, and communicated with others who have personal knowledge of the events and circumstances described herein. In addition, some of the information contained herein comes from my training and experience working on this and other financial investigations, and the legal information contained in this affidavit—such as references to the United States Code—is informed by my interactions with attorneys from the Department of Justice in connection with my investigation of this case.

5. Because I am submitting this affidavit for the limited purpose of establishing probable cause to support my application for a warrant to search and seize information associated with a

2

particular email account, it does not set forth every fact that I have learned during the course of my investigation. I have included only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of Title 18, United States Code, Section 371 (Conspiracy to Defraud the United States); Title 26, United States Code, Section 7206(1) (False Statements on a Return); and/or Title 26, United States Code, Section 7206(2) (Aiding and Assisting the Filing of a False Return), among other laws, will be found within the **TARGET ACCOUNT**.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§2703(a), (b)(1)(a), and (c)(1)(a). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offenses being investigated," *see* 18 U.S.C. § 2711(3)(a)(i), as established by the facts detailed herein.

## LEGAL BACKGROUND: CRIMINAL STATUTES

7.    Title 18, United States Code, Section 371 provides, "[i]f two or more persons conspire . . . to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371. Among other things, a person violates Section 371 if he conspires with others for the purpose of "impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service of the Department of the Treasury in the ascertainment, computation, assessment, and collection of revenue: to wit, income taxes." *United States v. Klein*, 247 F.2d 908, 915 (2d Cir. 1957). When Section 371 is invoked in this way, a person must act with deceptive intent to be guilty, because the "defraud" clause of Section 371 requires "deceit, craft or trickery, or at least means that are dishonest." *Hammerschmidt v. United States*, 265 U.S. 182 (1924).

3

8.     Title 26, United States Code, Section 7206(1) makes it a crime for any person to "[w]illfully make[] and subscribe[] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter." 26 U.S.C. § 7206(1).

9.     Title 26, United States Code, Section 7206(2) makes it a crime for any person to "[w]illfully aid[] or assist[] in, or procure[], counsel[], or advise[] the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document[.]" 26 U.S.C. § 7206(2).

10.     The facts set forth in this affidavit will establish probable cause to believe that the owner of the **TARGET ACCOUNT**, along with others known and unknown to your affiant, have violated the foregoing laws, and that evidence of those violations will be found within the **TARGET ACCOUNT**. Specifically, the facts set forth in this affidavit will show that the owner of the **TARGET ACCOUNT**, along with others known and unknown to your affiant, have conspired to systematically bend and break the rules set forth in the Internal Revenue Code, and in the associated regulations, that allow taxpayers to deduct a certain portion of their adjusted gross income based on the donation of a conservation easement over a piece of real property as a "charitable contribution," that they have been doing so since at least as early as 2013, and that they have acted to conceal their abuse of the system from the IRS.

11.     The facts set forth in this affidavit will establish probable cause to believe that the **TARGET ACCOUNT** has been used as an instrumentality in this conspiracy, and that it is likely to contain evidence of the existence and impermissible objectives of the conspiracy. In addition, the facts set forth in this affidavit will establish probable cause to believe that the owner of the **TARGET**

4

**ACCOUNT**, along with others known and unknown to your affiant, have submitted and aided in the submission of false documents to the Internal Revenue Service.

### LEGAL BACKGROUND: COMPUTATION OF INCOME TAX AND IMPACT OF CHARITABLE CONTRIBUTIONS

12.     The Title 18 and Title 26 offenses described herein relate to the abuse and misuse of "conservation easement tax deductions," a form of charitable-contribution tax deduction sometimes utilized by taxpayers to reduce their federal tax liability. For years, the targets of your affiant's investigation have been offering conservation easement tax deductions for sale to investors. The manner in which the targets of this investigation are operating is criminal, as set forth below.

13.     The law surrounding conservation easement tax deductions—and when they can and cannot be "syndicated" for sale to investors—is complex, so your affiant begins by offering some legal background on conservation easement tax deductions and their federal tax implications. The information in this section comes from your affiant's consultation with the attorneys working on this investigation, from your affiant's consultation with subject-matter experts within the IRS, and from your affiant's review of publicly-available primary and secondary materials relating to the laws governing conservation easement tax deductions and the methods employed by tax consultants to maximize the savings that flow therefrom.

14.     There are five steps to the calculation of any person's federal income tax liability. First, the taxpayer must determine his "gross income," a term which, pursuant to the Internal Revenue Code ("IRC"), means "all income from whatever source derived[.]" 26 U.S.C. § 61. Then, at the second step, the taxpayer may subtract certain "adjustments"—also known as "above-the-line" deductions— to determine his "adjusted gross income," or "AGI." *See* 26 U.S.C. § 62. At the third step, the taxpayer may choose whether to use the "standard deduction" or to "itemize" his "below-the-line" deductions. Whichever path he chooses, the taxpayer may then subtract his deductions—and his personal

exemptions, *see* 26 U.S.C. § 151—from his AGI, calculated at step two, to determine his "taxable income," or "TI." *See* 26 U.S.C. § 63. At the fourth step, the taxpayer calculates his preliminary tax liability by applying the tax rate tables to his TI, as determined at step three. Finally, at the fifth step, the taxpayer subtracts any "credits" to which he may be entitled from that preliminary tax liability amount. *See* 26 U.S.C. §§ 21-53. The amount he is left with is his tax due and owing.

15.     "Charitable contributions" are one of the several kinds of expenses that a taxpayer may deduct from his AGI at step three, as described above, if he chooses to itemize his below-the-line deductions. *See* 26 U.S.C. 170. Subject to certain limitations, a taxpayer may take a deduction for "any charitable contribution[,] payment of which is made within the taxable year." 26 U.S.C. § 170(a)(1). Usually, to get the full benefit of this rule, a taxpayer must donate his "entire interest" in a piece of real or personal property. *See* 26 U.S.C. § 170(f)(3)(A). However, the IRC makes an exception for "a qualified conservation contribution." *See* 26 U.S.C. § 170(f)(3)(B)(iii). Therefore, a taxpayer may claim a deduction for a *partial* donation of his interest in a piece of real property—such as the donation of an "easement" restricting the development of that property—so long as the donation meets the statutory requirements for a "qualified conservation contribution."

16.     For purposes of the IRC, a "qualified conservation contribution" means a "contribution (A) of a qualified real property interest, (B) to a qualified organization, (C) exclusively for conservation purposes." 26 U.S.C. § 170(h)(1)(A)–(C). The IRC goes on to provide further details with respect to each of the three requirements:

- A "qualified real property interest" means "any of the following interests in real property: (A) the entire interest of the donor other than a qualified mineral interest, (B) a remainder interest, and (C) a restriction (granted in perpetuity) on the use which may be made of the real property." 26 U.S.C. § 170(h)(2)(A)–(C).

- A "qualified organization" means, in relevant part, a 501(c)(3) organization that meets certain additional requirements. *See* 26 U.S.C. § 170(h)(3).

- The term "conservation purpose" means, in relevant part, "(i) the preservation of

6

land areas for outdoor recreation by, or the education of, the general public, (ii) the protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem, (iii) the preservation of open space (including farmland and forest land) where such preservation is (I) for the scenic enjoyment of the general public, or (II) pursuant to a clearly delineated Federal, State, or local governmental conservation policy, and will yield a significant public benefit, or (iv) the preservation of an historically important land area or a certified historic structure." 26 U.S.C. § 170(h)(4)(A)(i)–(iv).

17.     The paradigmatic example of how a taxpayer might take advantage of this provision of the IRC is through the donation of a "conservation easement" to a conservation-oriented non-profit. In the recorded deed of easement, the taxpayer agrees to a permanent restriction on the use and development of a parcel of his land that has been determined, by the non-profit, to constitute, say, an important habitat for an endangered or threatened species, or to otherwise qualify under 26 U.S.C. § 170(h)(4)(A)(i)–(iv). The non-profit assumes responsibility, in perpetuity, for enforcing and monitoring the restrictions contained within the deed of easement, and the donor can claim the value of his donation as a "charitable contribution" tax deduction. In this way, the law creates an economic incentive for private landowners to consider preserving their land in its natural—or historically significant—state, rather than to think only of maximizing the land's value through development.

18.     The next logical question goes to the relative size of that economic incentive, which depends on the appraised value of the donation. Whenever a taxpayer seeks to claim a deduction for a charitable contribution of more than $5,000, he must obtain "a qualified appraisal" of the Fair Market Value ("FMV") of the donated property interest, as of the time of donation, and attach it to the return for the taxable year in which he made the contribution. *See* 26 U.S.C. § 170(f)(11)(C). A "qualified appraisal" is one that complies with all regulations and other guidelines established by the IRS and that "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards[.]" *See* 26 U.S.C. § 170(f)(11)(E)(i).

19.     A "qualified appraiser" is an individual who "(I) has earned an appraisal designation

7

from a recognized professional appraiser organization or has otherwise met minimum education and experience requirements set forth in regulations prescribed by the Secretary, (II) regularly performs appraisals for which the individual receives compensation, and (III) meets such other requirements as may be prescribed by the [IRS] in regulations or other guidance." 26 U.S.C. § 170(f)(11)(E)(ii).

20.     IRS regulations establish additional rules, including that a "qualified appraisal" must be made not earlier than 60 days prior to the date of contribution of the property, *see* 26 C.F.R. § 1.170A-13(c)(3)(i)(A); that the appraisal does not involve a prohibited fee (such as one based in whole or in part on the appraised value returned by the appraiser), *see* 26 C.F.R. § 1.170A-13(c)(6)(i); and that the donor of the easement must not know that any information relied on by the appraiser was misleading or likely to produce an overvalued appraisal, *see* 26 C.F.R. § 1.170A-13(c)(5)(ii).

21.     In terms of the methods they employ, appraisers often determine the FMV of a conservation easement donation by subtracting the FMV of the property with the easement in place from the estimated FMV of the property in a hypothetical world where the easement was never donated, and where the property has been put to its "highest and best use," or "HBU."

22.     For example, if the owner/donor grants a conservation easement restricting all development on a 100-acre mountaintop lot, an appraiser might determine that the "remainder" interest still held by the owner/donor—the interest retained "underneath" the easement—is worth only $100,000, given the owner/donor's inability to develop the land in the future. However, the appraiser might determine that the HBU FMV for the property before the easement was donated would have been $4 million, based on an assessment of how profitable it could have been for the owner/donor to develop the lot into a subdivision of luxury homes and to sell them to individual purchasers. The delta between those two values—in this hypothetical example, $3.9 million—would be the FMV of the donation, and that amount would be deductible for the owner/donor as a charitable contribution starting in the year in which the easement was recorded, assuming compliance with all of

the statutory requirements recited above.[1]

23.     While the numbers in the foregoing paragraph are just a hypothetical, it is well known within the IRS (and within certain circles of high-net-worth taxpayers) that the tax savings that result from donations valued in this way can be considerable.  Taxpayers who donate property within one year of acquisition are limited to claiming a deduction equal to the lesser of their basis in the easement or its FMV, but, if the property is held for more than one year, then the deduction is not limited to basis, and may be as much as the FMV, calculated as described above.  In other words, qualified conservation contributions, in the form of the donation of conservation easements, can and do lead to deductions valued in the millions of dollars.

24.     The IRC allows taxpayers to deduct up to 50% of their annual income by making a contribution of this kind—up to 100% for certain farmers and ranchers—and to carry forward the deduction for up to fifteen years, if they are unable to exhaust it as a source of tax savings before that time has run.  See 26 U.S.C. §§ 170(b), (b)(1)(E).  In other words, if a taxpayer obtains an appraisal valuing his conservation contribution at a high enough price point, he can then use it to erase fifty (50) percent of his taxable income for each of the next fifteen (15) tax years.  However, even with a fifteen-year carry-forward provision in place, the tax savings that result from the donation of a conservation easement on a large piece of real property can be so significant that a large portion might go unrealized, when the benefits are left to flow to a single taxpayer.

25.     To get around that "problem"—and to make sure that every available cent of tax savings gets claimed—a cottage industry of "promoters" and "consultants" has sprung up in the conservation easement context, focused on funneling the benefits of large conservation easement tax deductions through tax-advantaged entities, like partnerships or LLCs, to multiple individual

---

[1]     Typically, a taxpayer may deduct contributions paid within a taxable year, but, with respect to conservation easements, the year of deduction is the year the deed of conservation easement is recorded.

9

taxpayers. An entity taxed as a partnership is not itself liable for income tax; instead, its partners or members are liable for income tax, in their separate or individual capacities, based on the income, losses, deductions, or credits that flow from the entity. Because of the manner in which partnerships "pass through" income and losses to their partners or members, they are commonly referred to as "pass-through" or "flow-through" entities.

26. In the conservation easement context, "promoters" and "consultants" use these pass-through entities, like partnerships and LLCs, to disseminate the benefits of a large conservation easement donation to multiple individual taxpayers. For example, a promoter might form a pass-through entity called "Conservation, LLC," and, through it, purchase and hold a large tract of real property with significant potential conservation value. After holding the real property for at least one year, the promoter might offer memberships in the LLC to "investors" for $25,000/share. Before the close of the following tax year, Conservation, LLC, will donate a conservation easement over its large tract of real property, and the tax savings will flow through, in parts proportionate to their ownership interests, to each of the members of the company. Often, the "promoter" will receive a fee for his services, taken out of the members' initial investments. In addition, assuming the appraised FMV of the easement donated by Conservation, LLC, comes in around where the promoter expected it would, the tax savings to each of the company's members will substantially exceed the amount of money that they initially invested.

27. This "syndication" of conservation easement tax deductions can be executed, and sometimes is executed, in a legal way. The key question is whether the individual taxpayer's investment in the partnership, or LLC, is a naked purchase of tax benefits—in which case it would be an abusive tax avoidance transaction—or whether the transaction had some independent "economic substance." The "economic substance doctrine," codified at 26 U.S.C. § 7701(o), holds that a "transaction shall be treated as having economic substance only if (A) the transaction changes in a meaningful way (apart

10

from Federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction." 26 U.S.C. § 7701(o)(1)(A)–(B).

28.     To illustrate the difference with a couple of contrasting hypotheticals, if an investor buys into a partnership to purchase and hold real property, with a genuine intention of developing or reselling the property, and with an expectation of sharing all economic risks, and only years later determines that a qualified conservation contribution makes more economic sense, then the investor's participation in the joint venture may well have had some economic substance. In contrast, if an investor goes to his accountant on tax day and learns that he can buy a membership in an LLC that day for $25,000, and get back $50,000 in tax savings, then he is probably engaged in the straightforward purchase of tax benefits, which would be an abusive tax avoidance transaction.

29.     The foregoing is the legal and regulatory background against which the targets in this investigation have been operating, and they have been violating many of these rules and regulations. The primary targets of your affiant's investigation are "promoters" and/or "consultants" who are engaged in the straightforward sale of conservation easement tax benefits, although the government is also investigating appraisers, accountants, other professionals, and at least one "conservation organization" who work in conjunction with those promoters and consultants.

30.     The **TARGET ACCOUNT** itself belongs to an Asheville-area appraiser, **WALTER "TERRY" ROBERTS**, whom your affiant is investigating for his role in this criminal conspiracy. As detailed below, your affiant has probable cause to believe that **ROBERTS** has used his nominal ability to meet the definition of a "qualified appraiser," preparing a "qualified appraisal" under the regulations, to provide cover to one of your affiant's primary targets, JACK EUGENE FISHER, who is engaged in the systematic and illegal sale of conservation easement tax deductions.

31.     Specifically, FISHER markets and sells tax benefits to high net-worth investors in

11

transactions that have no other economic substance, and he is successful in part because he predetermines the value of the tax benefits those investors will get for their money, making the enterprise a relatively safe investment bet. For example, an investor might know in advance that each dollar invested will return 4.5 dollars in tax deductions. However, in order to predetermine the value of the tax benefits he can market to investors in this way, FISHER needs to be able to predetermine and control the ultimate outcome of the appraisal process, which determines the valuation of the charitable contribution itself. **ROBERTS** allows FISHER to do that, while still drafting the actual appraisal paperwork so that it appears as though **ROBERTS** did the appraisal and FISHER was not involved.

32. As will be detailed hereafter, your affiant knows **ROBERTS** performed this role in the conspiracy with respect to at least two of FISHER's funds, and suspects that he did so with respect to at least seven other funds. **ROBERTS** communicates with FISHER and other conspirators using the **TARGET ACCOUNT**, and your affiant has probable cause to believe evidence will be found within the **TARGET ACCOUNT**. The conspiracy described above violates criminal statutes, including but not limited to 18 U.S.C. § 371 and 26 U.S.C. §§ 7206(1) and 7206(2).

## PROBABLE CAUSE

33. This conspiracy first came to the attention of IRS-CI in or around January of 2017. At that time, two whistleblowers, hereinafter referred to as CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2, came forward with evidence suggesting that JACK EUGENE FISHER, together with co-conspirators known and unknown to CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2, had been engaged in a multi-year scheme to promote and sell abusive tax shelters. Specifically, CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 claimed that FISHER had been involved in a conspiracy to sell conservation easement tax deductions to investors, and that it had already resulted in investors claiming many

12

millions of dollars in fraudulent tax deductions on their individual income tax returns.

34. According to CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2, each year, FISHER and his co-conspirators would organize and promote several large land-acquisition funds structured as flow-through entities, typically partnerships or LLCs. These funds would acquire large parcels of land with the intention of donating conservation easements over that land to affiliated conservation organizations, thereby creating a substantial tax benefit for the fund partners or members. Each year, FISHER and his co-conspirators would then sell interests, or units, in these funds to high net-worth taxpayers seeking large tax deductions.

35. CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 also reported that, in order to facilitate the scheme, FISHER and his co-conspirators would obtain grossly inflated appraisals of the HBU FMV of the real property held by the funds, through which they could maximize the value of the tax deduction to the fund partners. In reliance on these overvalued donations, the investors in the funds would claim exaggerated, fraudulent charitable contribution deductions on their federal income tax returns.

36. Based on the information provided by CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2, your affiant and other federal government agents and attorneys initiated an investigation. The facts set forth below were learned through CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 and the documents they provided and/or through the other investigative activities undertaken by your affiant and others, including but not limited to an extensive review of tax papers, property records, and other relevant documentation. In the following paragraphs, your affiant details relevant information learned from each of these sources, as they relate to establishing probable cause to search the **TARGET ACCOUNT**.

**A. Information Obtained from the CONFIDENTAL INFORMANTS.**

37. In or around January 2017, CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 made a whistleblower submission pursuant to 26 U.S.C. § 7623(b). The whistleblower office may pay awards to people who provide specific and credible information to the IRS in whistleblower submissions, if the information results in the collection of taxes, penalties, interest, or other amounts from the noncompliant taxpayer. If the IRS uses information provided by the whistleblower and actually makes a recovery, it may award the whistleblower up to 30 percent of the additional tax, penalty, and other amounts that it collects.

38. CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 contend, in their whistleblower submission, that FISHER and his co-conspirators, through their conservation easement syndication scheme, generated at least $500 million in fraudulent conservation easement deductions for the scheme's investors, resulting in a substantial tax loss. If that is true, and if the moneys are recovered, CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 could seek a substantial whistleblower award.

39. CONFIDENTIAL INFORMANT 1 and CONFIDENTIAL INFORMANT 2 (collectively, the "CONFIDENTIAL INFORMANTS") are real estate professionals with expertise in acquisition, sales, and development. CONFIDENTIAL INFORMANT 1 is a civil engineer and the president of a land-resource consulting firm in Asheville, North Carolina. CONFIDENTIAL INFORMANT 2 is a former real estate broker and member/manager of the same land-resource consulting firm as CONFIDENTIAL INFORMANT 1.

40. Together, the CONFIDENTIAL INFORMANTS engaged in two separate transactions with FISHER, both of which involved the placement of conservation easements over real property that the CONFIDENTIAL INFORMANTS, through two separate business entities, had purchased in Western North Carolina in 2011 and 2013. Through their involvement with FISHER in the context of those two transactions, detailed hereafter, the CONFIDENTIAL

14

INFORMANTS discovered the illegality of FISHER's scheme. A summary of the CONFIDENTIAL INFORMANTS' two transactions with FISHER illustrates the role that **ROBERTS**—and the **TARGET ACCOUNT**—play in this scheme.

### 1. FIRST TRANSACTION: FORT MYERS LIMITED PARTNERSHIP

41.    In 2011, the CONFIDENTIAL INFORMANTS purchased a business entity, FORT MYERS LIMITED PARTNERSHIP ("FMLP"), for the purchase price of $650,000. At the time of the purchase, FMLP was the 100% owner of a 405-acre tract of land situated within Buncombe County, North Carolina. According to the CONFIDENTIAL INFORMANTS, at the time of the purchase, they were considering using the land for commercial development or for the development of a wetland mitigation bank. The commercial development option fell through, and the CONFIDENTIAL INFORMANTS began to pursue the wetland mitigation bank strategy.

42.    In May of 2013, the CONFIDENTIAL INFORMANTS met FISHER through a business colleague with whom they had consulted about their conservation-oriented strategy for monetizing the 405-acre tract. The colleague introduced FISHER and his organization as "expert conservation consultants." Your affiant has since learned that conservation easements are, in fact, FISHER's primary business, but that FISHER holds himself out as possessing a broader expertise. FISHER includes a biography on the "our founder" page of his current business website, www.inlandcapitalfunds.com. According to the site, FISHER is a CPA. FISHER also worked for the Internal Revenue Service, for PricewaterhouseCoopers, and for other accounting firms prior to co-founding the accounting firm of AGEE, FISHER, BARRETT, LLC, ("AFB") located in Atlanta,

Georgia, in 1984.[2] In 1998, FISHER formed his own real estate development business, which has developed several properties throughout the southeast.

43. According to the CONFIDENTIAL INFORMANTS, after the introduction had been made, FISHER offered to syndicate a conservation easement over their real property in exchange for a consulting fee of $1 million, plus commissions on sales of investment interests in the easement. FISHER told the CONFIDENTIAL INFORMANTS that he had various professionals prepared to assist, organize, and market the conservation easement to investors. The CONFIDENTIAL INFORMANTS entered into an agreement with FISHER to pay him the $1 million consulting fee, with the conservation easement documentation to be completed and recorded by December 31, 2013, as would be necessary in order for the donor(s) of the easement to claim a tax benefit for 2013.

44. The benefit of this deal to the CONFIDENTIAL INFORMANTS was that they would receive a considerable sum as a "purchase price" from the corporate entity FISHER would form to purchase a controlling share of FMLP and to donate the easement, with the money for the purchase price coming from the investments into that entity.

  a. *FISHER and His Co-Conspirators Were Primarily Responsible for Structuring the Deal.*

45. According to the CONFIDENTIAL INFORMANTS, FISHER used two attorneys, JAMES SINNOTT and VI BUI, from the law firm of SINNOTT & COMPANY, to do the deal work for the FMLP conservation easement project. According to the CONFIDENTIAL INFORMANTS, with assistance from SINNOTT and BUI, FISHER formed a corporate entity, INLAND CAPITAL INVESTMENT FUND 2013 ("ICIF2013"), for the purpose of marketing the conservation easement FISHER was developing for the FMLP land to investors. According to records available on the

---

[2] The firm was named AGEE FISHER until 2006, when the name was changed to AGEE, FISHER, BARRETT, LLC.

website of the North Carolina Secretary of State, ICIF2013 was registered on or about July 3, 2013, in the State of North Carolina, and the "manager" for ICIF2013 is a company called INLAND CAPITAL MANAGEMENT, LLC ("ICM").

46.     FISHER himself currently serves as manager and Chief Executive Officer ("CEO") of ICM, which is a Nevada-based limited liability company. FISHER organized ICM in approximately 2017, and, according to its website, ICM has served as the manager of at least 16 real estate funds since approximately 2005.[3]  *See* www.inlandcapitalfunds.com.  ICM offers investors "capital appreciation that exceeds what is generally achievable through traditional equity and debt real estate investment vehicles." *See* www.inlandcapitalfunds.com.  A review of documentation within the custody of the IRS confirms that ICM appears as the "tax matters partner" on multiple "fund" tax returns, which further corroborates that ICM has structured deals like the ones FISHER did with the CONFIDENTIAL INFORMANTS on numerous other occasions.  In summary, FISHER is in charge of ICM, and ICM and/or a predecessor entity was the manager of ICIF2013.[4]  So, FISHER controlled ICIF2013, the entity he and his associates formed to purchase a controlling share in FMLP, in the context of their first transaction with the CONFIDENTIAL INFORMANTS.

47.     According to ICIF2013's Private Placement Memorandum ("PPM"), which your affiant has obtained and reviewed, FISHER then began to market "units" of ICIF2013 to investors at a price of $25,000 per unit.  According to the PPM, the fund intended to use the proceeds from the sale of the units to "acquire ownership, in whole or in part, of investments that are expected to . . .

---

[3]     Given the date range (all the way back to 2005), the website appears to be referring in part to the work of ICM's predecessor. Your affiant has learned that, several years ago, ICM was known as MCIINV South, LLC. Your affiant has also learned that ICM is owned 98% by FISHER FAMILY TRUST, LLC, and 2% by THE PRESERVE COMMUNITIES MANAGEMENT, INC., which is itself controlled by FISHER FAMILY TRUST and managed by FISHER. Your affiant learned this information by reviewing the Private Placement Memorandum prepared by FISHER and his co-conspirators for one of their "investment funds" of the type described herein.

[4]     Per Footnote, 2, *supra*, at the time of the events being described, ICM was probably still known as "MCIINV South, LLC," but your affiant will refer to the entity as ICM throughout this affidavit, for clarity purposes.

generat[e] attractive returns for investors." According to the CONFIDENTIAL INFORMANTS, that language was a reference to the plan through which FISHER, as manager of ICIF2013, would pay the CONFIDENTIAL INFORMANTS for the FMLP land, over which the easement was to be placed, by using ICIF2013 to buy a controlling share of FMLP from them.

48.    The parties did not reduce the details of the land sale to a writing until December 23, 2013, when the CONFIDENTIAL INFORMANTS and FISHER entered into an agreement wherein the CONFIDENTIAL INFORMANTS conveyed a 98% interest in FMLP to ICIF2013. The CONFIDENTIAL INFORMANTS retained the remaining 2% interest in FMLP. FISHER agreed to pay the CONFIDENTIAL INFORMANTS $7 million over a six-week period for the 98% interest conveyed to ICIF2013, with the money coming from investments into ICIF2013.

        *b.*     *FISHER's Formal Marketing Materials Displayed a Superficial Adherence to the Economic Substance Doctrine.*

49.    While the details of the deal between FISHER and the CONFIDENTIAL INFORMANTS were being worked out, FISHER was already marketing interests in ICIF2013 to prospective investors. On the surface level, the PPM for ICIF2013 pays lip service to the requirements of the "economic substance" test for the validity of a syndication of tax deductions, as discussed above. The PPM advises investors that the investment returns could come in the form of either "income production, capital appreciation and/or tax benefits," and that ICIF2013 might "achieve its objectives" by making tax-deductible donations of its property (or portions thereof) to a charitable organization. Toward the same end, the purported "business plan" for the real property to be acquired by ICIF2013, as outlined in the PPM, claimed to allow investors to choose from one of three options: (1) the development of the real property (the "Development Option"); (2) the holding of the real property for appreciation (the "Buy and Hold Option"), or (3) the placement of a substantial portion of the real property into a conservation easement for tax benefits (the "Green Investment Option").

18

The PPM advised investors that, following the acquisition of the real property in question, ICM (the manager entity controlled by FISHER) would make a recommendation to the investors about which of the three options to pursue, and the investors would formally vote to approve the selected option. According to the PPM, "if" the Green Investment Option were chosen through this process, then the investors would be able to offset their adjusted gross income in an amount equal to approximately 42% of their share of the donated conservation easement. The PPM further predicted that "if" the Green Investment Option were chosen, then the conservation easement would be donated to the SOUTHEAST REGIONAL LAND CONSERVANCY.

50.    The SOUTHEAST REGIONAL LAND CONSERVANCY ("SERLC") is a purported non-profit 501(c)(3) organization, founded in North Carolina in 2002, "dedicated to protecting natural resources through conservation easements." *See* www.serlc.org.[5] . SERLC has offices in Asheville, North Carolina, and Atlanta, Georgia. Your affiant has learned that an individual by the name of DAVID BRANNON is the current Chair of the SERLC Board of Directors, while JAMES WRIGHT is currently the Executive Director, and KAREN HIEMAN is the Deputy Director. From approximately 2010 through the present, at least nine funds managed by FISHER and his co-conspirators have donated purported conservation easements to SERLC. It is one of FISHER's primary conservation partners, and, as detailed hereafter, the individuals who manage SERLC are likely co-conspirators with FISHER.

51.    In any event, the purported three options detailed in the PPM for ICIF2013 were a farce, because there never was any economic substance to FISHER's syndication of the interests in the land owned first by FMLP, and then by ICIF2013, beyond the sale of tax benefits. The placement of a conservation easement over a significant portion of the land had always been a foregone

---

[5]    "Smoky Mountain Land Trust" was also created in 2002, in North Carolina, and is affiliated with SERLC.

conclusion. Indeed, it had been the fundamental assumption underlying the CONFIDENTIAL INFORMANTS' engagement of FISHER as a consultant, and underlying all of the interactions between FISHER and the CONFIDENTIAL INFORMANTS up to that point.

   c.   *Fisher's Direct Marketing Efforts Make Clear that the Real Purpose of the FMLP/ICIF2013 Transaction Was the Sale of Tax Benefits.*

52.     The CONFIDENTIAL INFORMANTS have provided an abundance of documents and communications to your affiant that confirm that the real purpose of the scheme was the straightforward sale of tax benefits, which, as noted in the legal background section of this affidavit, is illegal. The superficial adherence to the "economic substance" doctrine that appears in the PPMs and in some other formal materials was simply an effort to deceive the IRS, should the fund later be selected and assigned to a Revenue Agent for a civil examination.

53.     For one thing, outside of the formal marketing materials, FISHER marketed the funds to various investors, financial advisors, accountants, and attorneys with high net worth clients as a straightforward sale of tax benefits. For example, during the ICIF2013 marketing phase, FISHER, using the email account jack.fisher@afbllc,[6] forwarded to the CONFIDENTIAL INFORMANTS an email chain dated September 30, 2013, between one attorney-marketer, ANDREW SPEAKER, and FISHER. In the email, FISHER asked SPEAKER to provide "the number of different investors and timing of likely subscriptions so we can plan a bit." SPEAKER responded that he had approximately 40 individual investors, eight accounting firms and a plaintiff's firm on his list to speak to about the fund. SPEAKER explained to FISHER, "[t]he big thing for me is when I will have some final documentation on the ratio and appraisals to start talking to people to get them signed up." The "ratio" in this email refers to the ratio of tax savings per amount of investment into the fund, which

---

[6]     "afbllc" is an email domain associated with the accounting firm AFB, referenced earlier in this affidavit, which FISHER co-founded.

means SPEAKER and FISHER were openly discussing marketing ICIF2013 to investors based on a mathematical formula for how many dollars in tax savings they could expect in exchange for each investment dollar they paid into the fund.

54. Further, in an email exchange dated October 24, 2013, between FISHER, using the email account jfisher@thepreservecommunities.us, and the CONFIDENTIAL INFORMANTS, FISHER and CONFIDENTIAL INFORMANT 2 discussed the tax savings ratio FISHER had been promoting to certain investors. The CONFIDENTIAL INFORMANTS were upset because FISHER was marketing the fund at a higher return on investment ratio than previously discussed. FISHER explained to the CONFIDENTIAL INFORMANTS that "nothing had been agreed to" but "[l]ots of deals are floating around Atlanta with the 4.5 because the market here is flooded with folks." The "4.5" refers to the return on investment ratio in tax credits (i.e. $1 of investment returns $4.5 in federal and state tax benefits). FISHER, using the jfisher@thepreservecommunities.us account, then emailed SPEAKER, referenced above, explaining that the CONFIDENTIAL INFORMANTS were unhappy about the increase in the "write-off" from 4.2 to 4.5 and that the increase would also likely cause problems with FISHER's "New Jersey investors and [his] additional investors as they have been sold on a rather safe 4.2 with a residual investment."

55. All of these communications were well in advance of the supposed end-of-year "vote" by members of ICIF2013, at which time they would supposedly decide which of the three options set out in the PPM the fund would pursue, and these communications further demonstrate that FISHER's purpose all along was to market and sell tax benefits.

56. In yet another email exchange dated December 16, 2013, this time between FISHER, using the jfisher@thepreservecommunities.us account, and STEPHEN BLEVIT, an attorney with the law firm SIDLEY AUSTIN LLP, FISHER summarized the tax benefits for FISHER's current ICIF2013 offering:

> We have expanded our conservation offering with this year's offering projected to close our [sic] around 14 mm…We have been doing these for around 10 years and are well equipped to handle challenges from the IRS which is expected. Basically *you get a 4.25 to 1 write off for every dollar investment and you have a residual investment in the property not placed in easement.* There is a call option in place after the statue [sic] expires which is projected to give another 12% additional return.

(emphasis added). This email again demonstrates FISHER marketing ICIF2013 as a pure tax benefit play, as well as his knowledge that the IRS might want to take a closer look at what he is doing, and a boast that he knows how to outmaneuver the IRS. BLEVIN responded to FISHER stating, "Thanks for reaching out. In light of the new (higher) California income tax rates and my growing income, I've been thinking about this again. I'm interested to see how an investment of say, $50k, would impact my overall taxes paid. Can we set up a time to discuss later in the week?" BLEVIT ultimately invested $50,000 in the fund.

57.    Perhaps most egregious, and most clearly proving that the only purpose of this enterprise was the sale of tax benefits, the CONFIDENTIAL INFORMANTS have reported that FISHER continued to market and sell units of ICIF2013 to investors *after* the legal period for purchasing the units had expired. For example, according to the CONFIDENTIAL INFORMANTS, FISHER used special purpose vehicles ("SPVs") to sell units of ICIF2013 to interested investors as much as nine months into 2014, when the "charitable contribution" of the easement had already been made at the end of 2013. FISHER accomplished this by placing unsold units, at the end of 2013, into a separate LLC controlled by FISHER, and then selling membership interests in *that* LLC to investors. Putting aside any other legal issues associated with FISHER's resale of units in a private offering in this way, those secondary sales could not possibly have been premised on any purpose other than the purchase of tax benefits conferred by the donation of a conservation easement, because the conservation easement had already been placed. There is also an additional level of illegality involved anytime a taxpayer claims a right to a tax deduction based on a flow-through entity's donation of a

22

conservation easement when the taxpayer was not a member of that flow-through entity during the year in which the donation was made.

58.     Your affiant submits that the foregoing alone demonstrates a scheme to sell abusive tax shelters and to conceal the same from the IRS, which would violate 18 U.S.C. § 371. The "ratio" of tax savings to investment dollars was determined by FISHER's marketing needs, at a time before the appraisal for the property had even been completed, which shows that FISHER always intended to market tax benefits, and that he knew in advance where the appraisal would come back. However, FISHER's marketing activities for ICIF2013 were far from the only illegality associated with this scheme.

### d.     The ICIF2013 Appraisal Was Not a "Qualified Appraisal" for Purposes of the Internal Revenue Code.

59.     As noted in the "Legal Background" sections above, the value of a charitable contribution of a conservation easement must be determined through a "qualified appraisal." The value of the gift is what determines the size of the deduction, and the appraisal is how one values the gift. So, the appraisal determines the size of the deduction. For that reason, the appraisal must be an objective thing performed by an objective person not associated with the transaction.

60.     The appraisal used to justify the tax deductions that flowed from ICIF2013 was so far from objective as to constitute a sham. Nominally, it was performed by **WALTER "TERRY" ROBERTS**, the owner of the **TARGET ACCOUNT**. In reality, however, the value **ROBERTS** would ultimately return on his so-called "qualified appraisal" was predetermined by FISHER to suit his marketing needs. In this section, your affiant will detail documents and communications provided to your affiant by the CONFIDENTIAL INFORMANTS that demonstrate how the appraisal was put together in the case of FMLP/ICIF2013, before explaining in more detail why these documents

23

and communications contribute to probable cause to believe that criminal offenses have been committed.

61.     As early as June 2013—six months before the investors in ICIF2013 would supposedly "vote" on whether or not to pursue the "Green Investment Option"—FISHER, the CONFIDENTIAL INFORMANTS, **WALTER "TERRY" ROBERTS** (the Asheville-area appraiser retained by FISHER to perform the appraisal for the tract of land involved), JAMES WRIGHT (the Executive Director of SERLC, the conservation organization to which the easement would be donated), and others began discussing the valuation of the conservation easement to be placed over the FMLP/ICIF2013 real property.

62.     In an email dated June 24, 2013, approximately two weeks after the CONFIDENTIAL INFORMANTS' initial meeting with FISHER about the FMLP property, FISHER, using the jfisher@thepreservecommunities.us account, transmitted to CONFIDENTIAL INFORMANT 1 two spreadsheets consisting of FISHER's own "high" and "low" analysis for the value of the FMLP property and the estimated value of the contribution. In the email, FISHER explained "[t]his is just my best estimates [sic]...We can always get a preliminary appraisal estimate based on one plan and then modify if necessary based on the demographic analysis." FISHER's "high" estimated contribution was $66,991,058. This email was sent nearly six months before **ROBERTS** completed the final appraisal report, and it demonstrates FISHER's own personal involvement, from the beginning, in achieving an appraisal value that would deliver the appropriate "ratio" of tax benefits.

63.     Two days later, in an email dated June 26, 2013, FISHER wrote to DIANE PERMAR, the owner of a real estate advisor company, about obtaining a "demographic study which we will need to support our appraisal." FISHER explained in his email that his "primary focus is placing conservation easements on land and making tax benefits available to investors." This email again demonstrates that FISHER was actively involved in the process for obtaining the conservation

24

easement appraisal and, also, further confirms he was engaged in the sale of tax benefits based on the conservation easement.

64.     Similarly, in an email chain dating October 16-18, 2013, DAVID BRANNON, an employee at SERLC, using the email account dbrannon@siterhythms.com; FISHER, using the jack.fisher@afbllc.com account; and CONFIDENTIAL INFORMANT 1 discussed the conservation easement plan and how to maximize the value of the donation. In an email from that chain dated October 16, 2013, BRANNON provided a plan for the potential development of the FMLP/ICIF2013 property, stating that he had included 58 lots and that he had "also included some tracks [sic] that will benefit us when we get adjacent properties."[7] BRANNON further stated that there were two lots that "would serve really good conservation purposes but [CONFIDENTIAL INFORMANT 2] wanted to keep that area out. There are also a couple of floating lots that may be better left off but I wanted to give you more and allow us to widdle [sic] it down to those most desirable." FISHER forwarded the email from BRANNON to CONFIDENTIAL INFORMANT 1, asking him about the size of the proposed conservation easement, "[d]o you know approximately how many acres are not included in the lots vs. the acreage that is going into conservation?" This email demonstrates (1) FISHER's continuing active participation in the appraisal process; (2) that BRANNON, an employee of SERLC, the eventual easement donee and a supposedly objective third-party non-profit, was himself involved in the appraisal process by drafting a development plan to support the appraisal; and (3) that the conservation easement "Green Investment Option" was a foregone conclusion from the beginning.

---

[7]     As explained below, the CONFIDENTIAL INFORMANTS and FISHER eventually purchased the real property adjacent to the FMLP/ICIF2013 property and placed a conservation easement over that property, as well, in December 2014.

25

65.     The foregoing email exchange was then followed by a string of emails dated October 22-23, 2013, between FISHER, using the jack.fisher@afbllc.com email account; BRANNON, using the dbrannon@siterhythms.com account; CONFIDENTIAL INFORMANT 1; and JAMES WRIGHT, CFO of SERLC, using the email account jimw@twcpaga.com. In that chain, FISHER stated to BRANNON, "Just to be sure, we will have three separate tracts. Land not going into conservation which is marked on what we send – approximately 70-75 acres...". BRANNON then responded to the group, "...Let me know what tweaks are needed on the plan and I will be happy to adjust those today and calculate all the necessary acreage and linear footages of road...". On October 23, 2013, WRIGHT sent a reply to BRANNON and FISHER only, asking "[c]an I have the opportunity to discuss this after plan between just us 3 rather than it being considered a done deal since I just got it? I don't want to put anything in emails...We at least need to talk so I can point out potential CE [conservation easement] issues." Among other things, this email shows WRIGHT's knowledge (1) that FISHER and BRANNON were working on the "after" plan to be used in the appraisal (even though they were personally involved in the transaction and not "qualified appraisers"); (2) that they were treating the appraisal value that would ultimately be returned as a foregone conclusion; (3) and that WRIGHT did not want to have such conversations in writing.

66.     All of the foregoing conversations took place without participation from **WALTER "TERRY" ROBERTS**. As noted above, however, **ROBERTS** himself was, at least in theory, the "qualified appraiser" that FISHER ultimately retained to put the appraisal on paper. Still, even when **ROBERTS** got involved in the process, FISHER continued to be in charge. Various email exchanges between FISHER, the CONFIDENTIAL INFORMANTS, and **ROBERTS** about the appraisal make clear that FISHER and **ROBERTS** were working together to obtain a specific amount for the appraisal. For example, in a series of emails dated November 20, 2013, between FISHER, using the jack.fisher@afbllc.com account, and **ROBERTS**, using the **TARGET ACCOUNT**, FISHER gave

26

directions to **ROBERTS** about how to increase the "numbers" for the appraisal such as "add in an additional 12 million for golf/hotel based on their numbers...I am going to play around with the absorption, maybe front load it a bit more like he did to push it back up to where it was in the early preliminary stage." **ROBERTS** then wrote to FISHER indicating his compliance with FISHER's directions, stating, "Ok, when adding the $12M for the golf and hotel from the H&L report to this DCF we are just at Under $65 M buy [sic] about $230k."

67.     In another email exchange between FISHER, using the jack.fisher@afbllc.com account, and **ROBERTS**, using the **TARGET ACCOUNT**, dated December 2, 2013, **ROBERTS** sought FISHER's input on the draft appraisal report: "Read through [the draft appraisal report] and see what needs to be changed/corrected. I have several things I am going to add in for the IRS version but this should be enough for the investor version." Here, **ROBERTS**, the supposedly objective "qualified appraiser," is asking FISHER, who is the manager of the donor entity and who has been soliciting monetary investments based on promises to investors about the eventual value of the appraisal, to "correct" his purported "qualified appraisal." This email demonstrates, again, that FISHER was the real controlling participant in **ROBERTS**'s appraisal process, which was designed to reach the predetermined value needed to generate the amount of tax deductions promised to investors.

68.     To be clear, in addition to reinforcing that the "Green Investment Option" referenced in the PPM was always the only genuine option under consideration for ICIF2013—and that FISHER and his associates were therefore engaged in the straightforward sale of tax benefits through transactions with no other economic substance—these communications show independent illegal activity.

69.     As noted above, in order for an appraisal supporting the valuation of a charitable contribution to be a "qualified appraisal" under the Internal Revenue Code and implementing

regulations, it must be performed by a "qualified appraiser." Section 1.170A-13(c)(5) of Title 26 of the Code of Federal Regulations defines the term "qualified appraiser," and, in a vacuum, **ROBERTS** might qualify. *See* 26 C.F.R. § 1.170A-13(c)(5)(i). However, it also specifically lists people who <u>cannot</u> be considered a qualified "appraiser," and that list includes "[t]he donor," "[a] party to the transaction in which the donor acquired the property being appraised," "[t]he donee," and "[a]ny person employed by any of the foregoing persons." *See* 26 C.F.R. § 1.170A-13(c)(5)(iv).

70.     FISHER was the manager of "the donor"—ICIF2013—and the manager of "a party to the transaction in which the donor acquired the property being appraised," because he was the manager of ICIF2013 in its purchase of a controlling share of FMLP. At the very least, he was a "person employed by" those entities, and therefore ineligible to participate in the appraisal process. Likewise, BRANNON, who also contributed to the appraisal, was an employee of SERLC, "the donee." So was WRIGHT, a SERLC executive, whose own email, recounted above, shows that he was concerned about the process used by the conspirators. The CONFIDENTIAL INFORMANTS themselves would fall under these exclusions, as well, given their membership in the donor entity.

71.     All of these people, each of whom is excluded by regulation from performing the appraisal, were nonetheless heavily involved in the appraisal process. Indeed, the above communications suggest that **ROBERTS** was outright directed by FISHER to return a certain result. None of these people are "qualified appraisers," and the appraisal they produced, in concert, therefore was not a "qualified appraisal." It was a self-interested sham, thus rendering the "charitable contribution" made by ICIF2013 legally invalid from the outset.

  e.     *The FMLP/ICIF2013 Deal Concludes with over a Hundred Investors Buying Deductions Based on the Sham Appraisal.*

72.     Ultimately, in December 2013, a large portion of the real property owned by FMLP/ICIF2013 was placed into a conservation easement and donated to SERLC. The charitable

contribution deduction attributed to the donation of the conservation easement was valued at $66,214,000. That valuation was supported by the appraisal provided by **ROBERTS**, which was created through the illegal process outlined above. Notably, the final appraised value was nearly identical to the estimate FISHER had provided to the CONFIDENTIAL INFORMANTS in June 2013, at the very beginning of the process, over six months prior to the date of the final appraisal report. That further demonstrates that FISHER predetermined the appraisal process.

73. FMLP made the charitable contribution to SERLC, and the corresponding deduction was passed through to each partner of FMLP, based on the respective ownership percentages: 98% for ICIF2013, 1% for CONFIDENTIAL INFORMANT 1, and 1% for CONFIDENTIAL INFORMANT 2.

74. ICIF2013, in turn, passed through the tax savings to its members. By the time he was finished, FISHER had sold "units" of interest in ICIF2013 to approximately 107 "investors." Each of the 107 "investors" in ICIF2013 received a Form Schedule K-1 from ICIF2013 reporting a charitable contribution deduction of more than four times his or her initial capital contribution, just as FISHER had planned. Each investor was able to report that flow-through charitable contribution on his or her individual tax return, and to apply the corresponding deduction to reduce his tax liability.

75. All of these claimed deductions were based on documents submitted to the IRS in connection with the charitable contribution, including the **ROBERTS** appraisal of the contribution, which was an illegal and invalid appraisal directed by FISHER and his conspirators. In addition, as detailed above, the syndication of the tax benefits flowing from this first transaction was illegal, in that it was a straightforward sale of tax benefits with no other economic substance.

76. Your affiant submits that there is probable cause to believe, based on the communications outlined above, that FISHER and his associates knew they were selling tax benefits, and that they intentionally designed the superficial aspects of the deal—such as the PPMs distributed

29

to investors—to make it look as though there was an economic substance to the transactions, in an effort to deceive the IRS if the fund came under scrutiny.

## 2. SECOND TRANSACTION: THOMPSON MOUNTAIN HOLDINGS LLC

77.     As noted above, the CONFIDENTIAL INFORMANTS also engaged in a second transaction with FISHER and his co-conspirators, which they initiated while the first deal was still being worked out.   On December 19, 2013, the CONFIDENTIAL INFORMANTS created THOMPSON MOUNTAIN HOLDINGS LLC ("TMHL"), a limited liability company formed in the state of North Carolina. TMHL purchased approximately 273 acres of real property in Buncombe and Haywood counties, in Western North Carolina, for a purchase price of $4,748,441 on or about December 27, 2013. The CONFIDENTIAL INFORMANTS each owned a 50% interest in TMHL. This newly purchased property was adjacent to the FMLP/ICIF2013 property that was the subject of their first deal with FISHER.

78.     In October 2014, FISHER created SOUTHERN APPALACHIAN INVESTMENT FUND 2014 ("SAIF2014"), an investment fund similar to ICIF2013, described above.  As with ICIF2013, ICM (and therefore FISHER) would be the manager of SAIF 2014.  FISHER and his co-conspirators organized, promoted, and operated the SAIF2014 fund in the same manner as the ICIF2013 fund.

79.     The CONFIDENTIAL INFORMANTS provided emails and recorded conversations that demonstrate FISHER and his co-conspirators planned, from the beginning, to place a conservation easement over the TMHL real property.   Moreover, once again, FISHER improperly collaborated with **ROBERTS** and others, including an Asheville-area real estate agent by the name of HARRY REDFEARN and FISHER's attorney VI BUI, in a similar fashion, to create the final appraisal for the conservation easement placed over the property.

30

80.    For example, in an email dated September 18, 2014, that FISHER, using the jfisher@preservecommunities.com account, sent to ANDREW SPEAKER (one of the fund's promoters); the CONFIDENTIAL INFORMANTS; an individual named KATE JOY (whom your affiant knows to be FISHER's assistant at ICM); and VI BUI (counsel for ICM); FISHER stated, "Harry [R]edfearn will be providing a description of the easements by end of business today. [CONFIDENTIAL INFORMANT 1] will have his high yield and low yield plans along with ratings of lots by the end of business today. *I will provide this to Terry Roberts so he can have his preliminary appraisal complete by first of next week.*" (emphasis added).  This email demonstrates that, just as in the previous fund, FISHER and his co-conspirators worked together to manipulate the valuation of the conservation easement, and that **ROBERTS**, who was supposed to be acting as a "qualified appraiser" under the law, was likely just returning the results FISHER told him to return. Furthermore, the email makes clear that the collaboration on the valuation of the easement began well before the formal "vote" to opt for the "Green Investment Option" on the TMHL/SAIF2014 property was set to occur in December 2014, pursuant to a PPM that was very similar to the one issued for the FMLP/ICIF2013 deal.

81.    FISHER also sought advice from others about the contents of the promotional material for the SAIF2014 fund, particularly about how it described the conservation easement options. FISHER, using the jfisher@preservecommunities.com account, forwarded to CONFIDENTIAL INFORMANT 1 an email dated October 21, 2014, from AARON KOWAN, an attorney, in which KOWAN cautioned FISHER about his description of the conservation easement option—the so-called "Green Investment Option"—in the promotional materials. KOWAN warned FISHER to "be careful of stating anywhere that conservation/preservation is the likely outcome. For example, in the Turnpike document (p.5), it says that the elevation of the targeted tracts allows for the 'preservation of two mountain tops.' That sounds like conservation/preservation is pre-determined."

31

This email demonstrates that FISHER knew the "Green Investment Option" should not be predetermined—even though it was—and that there was an effort by the conspirators to make the fund documents look legitimate and conceal such predetermination.

82. In another email dated November 10, 2014, FISHER, using the jfisher@preservecommunities.com account, emailed HARRY REDFEARN at the Harry@pmclifestyle.com account, asking REDFEARN to review a final, appraisal-connected plan for TMHL that **ROBERTS** (the appraiser) had provided to FISHER in October 2014. FISHER provided specific directions about how REDFEARN should draft a memorandum to support the appraisal that FISHER would ultimately obtain from **ROBERTS**:

> Could you guys look at the lot evaluation section of the spreadsheet. I believe you had stated before that you could do a broker's opinion of value. I was thinking we could combine this with a memo of some type on the planning meeting we had where you could reference the proposed amenities and comment on the lot evaluation and notation that this would be the only community with high elevation views this close to Asheville.

This communication demonstrates, yet again, that FISHER was the real master of the appraisal process.

83. Furthermore, in an email dated November 12, 2014, from FISHER, using the jfisher@preservecommunities.com account, to the CONFIDENTIAL INFORMANTS, FISHER told the CONFIDENTIAL INFORMANTS that he would "[a]lso need to help Terry finish the appraisal." Then, in an email dated November 13, 2014, sent to FISHER and KATE JOY (FISHER's assistant at ICM), from **ROBERTS**, using the **TARGET ACCOUNT**, **ROBERTS** indicated that his final appraisal would be based on certain material that FISHER still needed to provide, including the marketing material for the fund, as well as a copy of the easement (again indicating the predetermination of the "vote" by the investors). **ROBERTS** provided the following list:

Deeds
Tax Cards

32

Price List
Plats before and after site...
Pictures (You should have hard copies of these)
Easement (I will need a copy of this after it is signed and implemented for the final appraisal in January)
Marketing Brochure (The one that showed potential before amenities and the actual after amenity, as well as the lodge that will be an amenity for the larger overall subdivision.)

84. In addition, in an email exchange dated November 18, 2014, REDFEARN, using the email account harry@pmclifestyle.com, emailed FISHER and KATE JOY about a draft broker price opinion ("BPO") he was compiling at FISHER's request to support the **ROBERTS** appraisal. REDFEARN wanted to confirm with FISHER that he was "heading down the right path with respect to this broker opinion." REDFEARN asked if there was other information that FISHER wanted REDFEARN to include. On November 19, 2014, FISHER forwarded the email to the CONFIDENTIAL INFORMANTS for additional comments, "Can you please review and comment. I think you have terry's [meaning **ROBERTS's**] draft appraisal." This email demonstrates FISHER's involvement in all aspects of the drafting of the appraisal, including REDFEARN's BPO, which was drafted in order to provide support the final valuation of the conservation easement.

85. In summary, your affiant submits that the facts indicate that the TMHL appraisal was not a "qualified appraisal" performed by a "qualified appraiser," because FISHER, an interested person in numerous ways, again directed and participated in the appraisal process. However, in the case of TMHL, FISHER took the illegality a step farther. In addition to working with **ROBERTS** to manipulate the final appraisal value, as outlined above, in this case, FISHER and **ROBERTS** included false assumptions in the appraisal.

86. For example, the CONFIDENTIAL INFORMANTS reported that the final appraisal returned by **ROBERTS** for the TMHL/SAIF2014 property assumed, as a part of its valuation of the charitable contribution, existing public access to the property by an asphalt road.

33

Your affiant reviewed the appraisal submitted in support of the eventual tax deductions and confirmed that the existence of such a road is an assumption. The final appraisal for the property, as prepared by **ROBERTS**, describes the main road as "a private asphalt road with a 45' right of way that connects to a number of additional private roads." According to the CONFIDENTIAL INFORMANTS, however, the road assumed by the appraisal did not exist, and never has existed. Moreover, FISHER's communications make clear that the inclusion of this fictitious road in **ROBERTS**'s appraisal as an assumption was no accident. In an email dated November 15, 2014, in response to a question from WRIGHT (from SERLC, the donee) about the TMHL/SAIF2014 valuation, FISHER, using the jfisher@preservecommunities.com account, forwarded WRIGHT's email to the CONFIDENTIAL INFORMANTS, noting in relevant part, "One of our assumptions is that we have built the road to the beginning of the property so we could have an increase in the after value."

87.     In other words, FISHER and **ROBERTS** included, in **ROBERTS**'s supposedly objective appraisal for the TMHL/SAIF2014 charitable contribution, an assumption of public access to the property through a paved road that simply did not exist.

88.     As with the FMLP/ICIF2013 deal, FISHER managed to sell tax deductions to over a hundred investors. However, unlike the FMLP/ICIF2013 deal, at the time TMHL donated the real property to SERLC, SAIF2014 did not hold an ownership interest in the TMHL. Although the CONFIDENTIAL INFORMANTS and FISHER had made an informal agreement that SAIF2014 would purchase 97% of the ownership of TMHL, the agreement was never finalized or reduced to a signed writing. Thus, technically, SAIF2014 was not entitled to a charitable contribution deduction for the donated easement and, as a result, neither were its investors. This is yet another problem with the fund's structure. Nevertheless, SAIF014's investors claimed the deductions. The **ROBERTS** appraisal valued the charitable contribution at $24,240,000, and FISHER had sold "units" of interest in SAIF 2014 to approximately 105 "investors." Thus, each of the investors in SAIF 2014 received a

.34

Form Schedule K-1 reporting a charitable contribution more than four times his or her capital contribution, just as FISHER had planned from the beginning.

89. Here, again, the facts show FISHER and his co-conspirators collaborating from the beginning of the deal to engage in a straightforward sale of tax benefits, and they also show FISHER and others, including **ROBERTS**, collaborating to put together an illegal and invalid appraisal directed by persons excluded by regulation from the definition of "qualified appraiser" and, in this instance, based in part on false assumptions about the state of the property. Here, again, FISHER and his co-conspirators developed marketing materials with an eye towards lending a superficial air of legality and compliance with the economic substance doctrine to their process, despite the illegal reality of their business. Here, again, investors ultimately took substantial deductions on their tax returns that were based on a valuation contained within an invalid appraisal.

90. Based on all of the foregoing, your affiant submits that there is probable cause to believe that FISHER and others, including **ROBERTS**, have engaged in a conspiracy to defraud the IRS with respect to taxes, in violation of Title 18, United States Code, Section 371, as interpreted by *Hammerschmidt v. United States*, 265 U.S. 182 (1924), and *United States v. Klein*, 247 F.2d 908, 915 (2d Cir. 1957). FISHER and his collaborators are engaged in the sale of tax benefits through transactions that have no other economic substance, and they regularly prepare formal marketing materials that attempt to mask their practice by presenting multiple options to investors, despite the fact that FISHER is privately marketing his funds exclusively as a vehicle for tax deductions. Moreover, FISHER has used **ROBERTS** to provide a veneer of legality to the appraisals that FISHER essentially creates himself to support a predetermined tax-savings ratio that is vital to FISHER's marketing activities.

91. The foregoing facts establish probable cause to believe that **ROBERTS** was involved in FISHER's conspiracy from at least 2013 through 2015, and that he used the **TARGET ACCOUNT** to further the business of that conspiracy. However, your affiant and other law

35

enforcement officers have conducted additional investigative steps to determine the full scope of **ROBERTS**'s participation in FISHER's illicit enterprise. Through a review of federal tax materials, your affiant's team has identified **ROBERTS** as having prepared the appraisals in connection with at least nine of FISHER's funds, including the two referenced above, spanning the tax years 2008 through 2018 (meaning the most recent appraisal may not have been completed until around the time of tax day 2019). The email communications between **ROBERTS** and FISHER, outlined above, suggest a comfort level, on the part of **ROBERTS**, with the brazen way in which FISHER was operating by the time the CONFIDENTIAL INFORMANTS first became involved in 2013, despite the obvious illegality of allowing the person marketing tax deductions to investors (FISHER) to predetermine the results of a supposedly objective appraisal process, or, even more markedly, of basing a "qualified appraisal" on a false assumption of the existence of a road that has never been built. Your affiant therefore respectfully submits that there is probable cause to believe that **ROBERTS** and FISHER had engaged in the same type of conduct before, and that there is probable cause to support a search of the TARGET ACCOUNT designed to capture communications relating to each of the nine funds ROBERTS worked with FISHER.

92.     A search of the **TARGET ACCOUNT**'s contents for the duration of the time period in which **ROBERTS** has worked with FISHER is therefore likely to turn up evidence of additional wrongdoing, by **ROBERTS**, FISHER, and others involved in the conspiracy, as well as to build out the government's picture of FISHER's criminal enterprise as a whole. Based on all of the foregoing, your affiant respectfully submits that there is probable cause to justify the requested search and seizure of records from the **TARGET ACCOUNT** for the date range **January 1, 2008, through the present**. Furthermore, through the use of publicly available domain look-up tools, your affiant's investigative team has been able to determine that the **TARGET ACCOUNT**—and the **TARGET ACCOUNT**'s host domain, brbappraisal.com—are hosted by Google LLC.

36

## BACKGROUND REGARDING GOOGLE LLC'S SERVICES

93.     Google LLC ("Google") is the provider for the **TARGET ACCOUNT**. Google provides its subscribers internet-based accounts that allow them to send, receive, and store e-mails online. Google accounts are typically identified by a single username, which serves as the subscriber's default e-mail address, but which can also function as a subscriber's username for other Google services, such as instant messages and remote photo or file storage.

94.     Based on my training and experience, I know that Google allows subscribers to obtain accounts by registering on Google's website. During the registration process, Google asks subscribers to create a username and password, and to provide basic personal information such as a name, an alternate e-mail address for backup purposes, a phone number, and in some cases a means of payment. Google typically does not verify subscriber names. However, Google does typically verify the e-mail address or phone number provided.

95.     Once a subscriber has registered an account, Google provides e-mail services that typically include folders such as an "inbox" and a "sent mail" folder, as well as electronic address books or contact lists, and all of those folders are linked to the subscriber's username. Google subscribers can also use that same username or account in connection with other services provided by Google. Google's other services may include: electronic communication services such as Google Voice (voice calls, voicemail, and SMS text messaging), Hangouts (instant messaging and video chats), Google+ (social networking), Google Groups (group discussions), Google Photos (photo sharing), and YouTube (video sharing); web browsing and search tools such as Google Search (internet searches), Web History (bookmarks and recorded browsing history), and Google Chrome (web browser); online productivity tools such as Google Calendar, Google Contacts, Google Docs (word processing), Google Keep (storing text), Google Drive (cloud storage), Google Maps (maps with driving directions and local business search) and other location services, and Language Tools (text

37

translation); online tracking and advertising tools such as Google Analytics (tracking and reporting on website traffic) and Google AdWords (user targeting based on search queries); Pixel Phone (services which support a Google smartphone); and Google Play (which allow users to purchase and download digital content, e.g., applications).

96.     In general, user-generated content (such as e-mail) that is written using, stored on, sent from, or sent to a Google account can be permanently stored in connection with that account, unless the subscriber deletes the material. For example, if the subscriber does not delete an e-mail, the e-mail can remain on Google's servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to exist on Google's servers for a certain period of time.

97.     Thus, a subscriber's Google account can be used not only for e-mail but also for other types of electronic communication, including instant messaging and photo and video sharing; voice calls, video chats, SMS text messaging; and, social networking. Depending on user settings, user-generated content derived from many of these services is normally stored on Google's servers until deleted by the subscriber. Similar to e-mails, such user-generated content can remain on Google's servers indefinitely if not deleted by the subscriber, and even after being deleted, it may continue to be available on Google's servers for a certain period of time. Furthermore, a Google subscriber can store contacts, calendar data, images, videos, notes, documents, bookmarks, web searches, browsing history, and various other types of information on Google's servers. Based on my training and experience, I know that the types of data discussed above can include records and communications that constitute evidence of criminal activity.

98.     Based on my training and experience, I know that providers, such as Google, also collect and maintain information about their subscribers, including information about their use of Google services. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status

of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the Google website), and other log files that reflect usage of the account. Providers such as Google also commonly have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with other logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which devices were used to access the relevant account. Also, Providers such as Google typically collect and maintain location data related to subscriber's use of Google services, including data derived from IP addresses and/or Global Positioning System ("GPS") data.

99.     Based on my training and experience, I know that Providers such as Google also collect information relating to the devices used to access a subscriber's account – such as laptop or desktop computers, cell phones, and tablet computers. Such devices can be identified in various ways. For example, some identifiers are assigned to a device by the manufacturer and relate to the specific machine or "hardware," some identifiers are assigned by a telephone carrier concerning a particular user account for cellular data or voice services, and some identifiers are actually assigned by Google in order to track what devices are using Google's accounts and services. Examples of these identifiers include unique application number, hardware model, operating system version, Global Unique Identifier ("GUID"), device serial number, mobile network information, telephone number, Media Access Control ("MAC") address, and International Mobile Equipment Identity ("IMEI"). Based on my training and experience, I know that such identifiers may constitute evidence of the crimes under investigation because they can be used (a) to find other Google accounts created or accessed by the same device and likely belonging to the same user, (b) to find other types of accounts linked to the same device and user, and (c) to determine whether a particular device recovered during course of the investigation was used to access the Google account.

39

100.    Based on my training and experience, I know that Providers such as Google use cookies and similar technologies to track users visiting Google's webpages and using its products and services. Basically, a "cookie" is a small file containing a string of characters that a website attempts to place onto a user's computer. When that computer visits again, the website will recognize the cookie and thereby identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to Google. More sophisticated cookie technology can be used to identify users across devices and web browsers. From training and experience, I know that cookies and similar technology used by Providers such as Google may constitute evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Google account and determine the scope of criminal activity.

101.    Based on my training and experience, I know that Google maintains records that can link different Google accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple Google accounts. Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular Google account.

102.    Based on my training and experience, I know that subscribers can communicate directly with Google about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers such as Google typically retain records about such communications, including records of contacts between the user and Provider's support services, as well records of any actions taken by the Provider or user as a result of the communications. In my

training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

103. In summary, based on my training and experience in this context, I believe that the computers of Google are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved e-mail for Google subscribers), as well as Google generated information about its subscribers and their use of Google services and other online services. In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. In fact, even if subscribers provide Google with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

104. As explained above, information stored in connection with a Google account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element of the offense, or, alternatively, to exclude the innocent from further suspicion. From my training and experience, I know that the information stored in connection with a Google account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by Google can show how and when the account was accessed or used. For example, Providers such as Google typically log the IP addresses from which users access the account along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the Google account access and use relating to the criminal activity under investigation. This geographic and timeline information may tend to

either inculpate or exculpate the person who controlled, used, and/or created the account. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Finally, stored electronic data may provide relevant insight into the user's state of mind as it relates to the offense under investigation. For example, information in the Google account may indicate its user's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

105.    Based on the forgoing, your affiant submits that there is probable cause to believe the **TARGET ACCOUNT** has been used in connection with the aforementioned violations of the federal criminal laws, and that evidence of the crimes will be found within the content of the **TARGET ACCOUNT**. Your affiant respectfully requests the issuance of the requested search warrants based on the facts contained within this affidavit. Because the warrants will be served on Google, who will then compile the requested records at a time convenient to each of them, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Special Agent Jennifer Berry, Affiant
IRS – Criminal Investigation
*This affidavit has been reviewed by AUSA Daniel Bradley*

SUBSCRIBED AND SWORN before me this _____ 15 _____ day of October, 2019:

The Honorable W. Carleton Metcalf
United States Magistrate Judge
Western District of North Carolina

42

## Attachment A

### Property to Be Searched

This warrant covers the date range of **January 1, 2008, through the present**, and authorizes a search of any and all information associated with, and any and all contents of, the email account **walter.roberts@brbappraisal.com**, that is stored at premises owned, maintained, controlled, or operated by Google LLC, a company that accepts service of legal process at 1000 Amphitheater Parkway, Mountain View, California 94043, and/or at the email address USLawEnforcement@google.com.

1

## Attachment B

### Things to be Seized (Two-Step Process)

This warrant requires Google LLC to disclose the information identified in Part I to the government within 14 days from the service of this warrant. The government will then conduct a search of the information produced by Google LLC and will determine which information falls within the scope of Part II. This warrant authorizes the government to copy and retain any information that falls within the scope of Part II. The government will then seal any information provided by Google LLC that does not fall within the scope of Part II, and will not engage in any further review of that information absent an additional order of the Court.

Part I:        Information to be disclosed to the government by Google LLC

To the extent that any information associated with the account described in Attachment A is within the possession, custody, or control of Google LLC regardless of whether such information is stored, held, or maintained inside or outside of the United States, and including but not limited to any emails, records, files, logs, or information that has been deleted but is still available to Google LLC, or that has been preserved pursuant to the request made under 18 U.S.C. § 2703(f) on July 29, 2019, Google LLC, is required to disclose the following information to the government for the account listed in Attachment A:

a. The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

b. The contents of all communication including text messages, voicemails, recorded calls, and chat messages associated with the account, including stored or preserved copies of chat logs, draft communications, the source and destination addresses associated with each communication, the date and time at which each communication was sent, and the size and length of each communication;

2

c. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

d. The types of service utilized;

e. All records or other information stored at any time by an individual using the account, including address books, YouTube, Google Drive or other cloud storage, Google Talk, Google Calendar, iGoogle, contact and buddy lists, calendar data, pictures, and files;

f. All records pertaining to communications between Web.com (Network Solutions, LLC) and any person regarding the account, including contacts with support services and records of actions taken.

g. For each account listed in Attachment A, all accounts that are linked to that account by cookies, creation IP address, recovery email address, and/or telephone number.

Google LLC is hereby ordered to disclose the above information to the government within **14 days** of the service of this warrant.

**Part II:      Information to be seized and retained by the government**

All information described in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Section 371 (Conspiracy), and/or Title 26, United States Code, Section 7206(1) (False Return) or (2) (Aiding and Assisting in the Preparation of a False Tax Return), and the aiding and abetting of these offenses, as well as all information described in Section I that constitutes fruits, contraband, evidence and instrumentalities of any other criminal violations, including information pertaining to the following matters

a. Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Account about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

3

b. Information that constitutes evidence indicating the Account user's state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

c. Information that constitutes evidence concerning how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account user;

d. Evidence reflecting communications or correspondence between Roberts and Fisher, members of Fisher's organization, employees of SERLC, Harry Redfearn, and other potential co-conspirators as well as any issues related to the drafting and/or revision of the appraisals generated by Roberts.

e. Evidence concerning payments or other compensation Roberts received in exchange for the services he provided to Fisher and Fisher's organization; and

f. Evidence concerning the location of other evidence of the Subject Offenses, including evidence regarding the location of storage containers and electronic or cloud-based storage.

4